IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 01-cv-02163-BNB-MEH

SIERRA CLUB and
MINERAL POLICY CENTER,

      Plaintiff,

v.

EL PASO PROPERTIES, INC. (formerly known as EL PASO GOLD MINES, INC.),

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This is a citizen suit under the Clean Water Act ("CWA" or "Act"), 33 U.S.C. §§1251, *et seq.*   Plaintiffs, Sierra Club and Mineral Policy Center, claim that the Defendant, El Paso Properties, Inc. (formerly El Paso Gold Mines, Inc.), violated Section 402 of the Act, 33 U.S.C. §1342, by discharging pollutants from a point source into navigable waters without a valid permit. The parties have consented to the determination of this case by a United States Magistrate Judge under 28 U.S.C. §636(c). The matter was tried to the court for five days beginning February 5, 2007. The following constitutes my findings of fact and conclusions of law.

I.    Procedural History

Plaintiffs initiated this action in November 2001. Following discovery, the parties filed cross motions for summary judgment in September 2002. Defendant argued that the court lacked subject matter jurisdiction over this citizen suit because plaintiff failed to

allege an ongoing violation of the CWA, as required by 33 U.S.C. §1365(a)(1); that purely passive landowners could not be held liable for discharges under 33 U.S.C. §1311(a); and that Plaintiffs could not establish a hydrological connection between the alleged point source (the El Paso Shaft) and the alleged navigable water (Cripple Creek).   Former United States Magistrate Judge Patricia A. Coan[1] rejected each of El Paso's arguments and granted summary judgment in favor of the Plaintiffs.   El Paso appealed.   The Tenth Circuit Court of Appeals affirmed Judge Coan's rulings that the district court had subject matter jurisdiction over the case and that El Paso could be held liable under Section 402 of the CWA for the "discharge" of a pollutant even though it had never actively mined its property.   *See Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1141, 1145 (10th Cir. 2005).   The circuit court, however, reversed the grant of summary judgment in favor of Plaintiffs, finding that there were disputed material facts on the issue of whether a hydrological connection exists between the El Paso Shaft and the Roosevelt Tunnel Portal. The case was remanded for further proceedings.

The CWA makes it unlawful for "anyone to discharge pollutants into the Nation's waters except pursuant to a permit."   *Milwaukee v. Illinois*, 451 U.S. 304, 310 (1987); 33 U.S.C. §1311(a), §1342.   "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source."   33 U.S.C. §1362(12).   To prove a CWA violation, Plaintiffs must establish that pollutants discharged from the El Paso Shaft make their way to the Roosevelt Tunnel Portal and are discharged into Cripple Creek. *Sierra Club*, 421 F.3d at 1146 (citing 33 U.S.C. §1311(a), §1362(12)).

---

[1]This case was assigned to me on September 26, 2006.

II.    Findings of Fact

1.    The Roosevelt Tunnel is a six-mile long, man-made tunnel that was constructed to drain water from mines in the Cripple Creek Mining District ("Mining District") in Teller County, Colorado.

2.    El Paso Properties, Inc. ("El Paso") owns approximately 100 acres of inactive mining claims and surface rights known as the El Paso Mine,  situated between the towns of Cripple Creek and Victor in Teller County, Colorado.

3.    El Paso's property surrounds and includes the El Paso Shaft (the "Shaft"), a vertical shaft that extends from the land surface and connects underground to the Roosevelt Tunnel by a short "drift."

4.    The Shaft intersects the Roosevelt Tunnel at approximately 14,000 feet east of the Roosevelt Tunnel Portal.

5.    The point where the Roosevelt Tunnel exits the ground is referred to as the Roosevelt Tunnel Portal (the "Portal").  The Portal is located along Shelf Road, County Road 88 in Teller County, Colorado.

6.    Multiple properties, including portions of El Paso's property, overlie, connect to, and are drained by the Roosevelt Tunnel.

7.    El Paso has no property interest in the Roosevelt Tunnel, which is under the jurisdiction of the United States Bureau of Land Management.

8.    The Carlton Tunnel was excavated about sixty years ago at an elevation approximately 1,000 feet below the Roosevelt Tunnel for the purpose of draining groundwater in the Mining District to a level below the Roosevelt Tunnel.

9.      The Mining District is characterized by two distinct geological units: a Tertiary diatreme complex (composed of a mass of fractured, mineralized volcanic rocks); and, a Precambrian country rock that includes granites and other hard massive rocks.  El Paso's property lies outside the diatreme on the country rock.  The country rock is less broken and fractured than the rock in the diatreme.  The Roosevelt Tunnel penetrates both the diatreme and the country rock.

10.     Water travels through the country rock only on preferential flow paths such as faults, fractures, and places where the rock has been broken.  Water flows more easily within and through the diatreme.

11.     Water containing zinc, manganese, aluminum, and sulfate flows from the base of the Shaft into the Roosevelt Tunnel.

12.     Additional water enters the Roosevelt Tunnel between the Shaft and the Portal through faults and fractures in the granite rock.

13.     The granite rock surrounding the Roosevelt Tunnel contains variable areas of mineralization.

14.     Water is discharged from the Portal into Cripple Creek on an intermittent basis.

15.     The Colorado Water Quality Control Division ("CWQCD") has been investigating the Roosevelt Tunnel discharge since approximately 1994 or 1995.  At that time, the Cripple Creek and Victor Gold Mining Co. ("CC&V")[2] began submitting to the

---

[2]CC&V owns and operates a gold mine adjacent to El Paso's property.  A portion of CC&V's property is located above the Roosevelt Tunnel upgradient from the intersection of the Tunnel with the El Paso Shaft.  CC&V's property is located above and within the main diatreme that provides most of the ore

4

CWQCD and the Environmental Protection Agency ("EPA") monthly results of flow measurements and water quality sampling taken at the Portal.   EPA released CC&V from the obligation to monitor the Roosevelt Tunnel in May 2002.

16.    Since 1994, water samples have been collected inside the Roosevelt Tunnel on six days.  Samples taken on only five of the days are relevant.[3]  The results in micrograms per liter for dissolved zinc (Zn), dissolved manganese (Mn), aluminum (Al), and sulfate ($SO_4$) are shown in Table 1 below:

---

(cont.)
producing rock in the Mining District.

[3]The single water quality sample obtained on May 26, 1995, was collected east and upgradient of the El Paso Shaft. (Plaintiffs' Ex.  23)

5

| | May 13, 1994 | Oct. 14, 1994 | 0ct. 23, 1996 | Nov. 16, 2000 | Aug. 7, 2001 |
|---|---|---|---|---|---|
| El Paso Shaft (approx 14,000 ft E. of the Portal) | 2.1 mg/l (Zn) | 4.3 mg/l (Zn) 51.000 mg/l (Mn) 2.200 mg/l (Al) 1300 mg/l (SO4) | ----- | 2.30 mg/l (Zn) 26.1 mg/l (Mn) 1.69 mg/l (Al) 1397 mg/l(SO4) | 2.63 mg/l (Zn) 23 mg/l (Mn) 2.84 mg/l (Al) 1423 mg/l (SO4) |
| 2000 ft west of the El Paso Shaft (RT-EP 2000)(approx 12,000 ft E. of the Portal) | ----- | 0.009 mg/l (Zn) 0.660 mg/l (Mn) -0.100 mg/l (Al) 380 mg/l (SO4) | ----- | ----- | ----- |
| 3000 ft west of the El Paso Shaft (RT-EP 3000)(approx 11,000 E. of the Portal) | ----- | 0.009 mg/l (Zn) 0.460 mg/l (Mn) -0.100 mg/l (Al) 420 mg/l (SO4) | ----- | ----- | ----- |
| 4000 ft west of the El Paso Shaft) RT-EP 4000 (approx 10,000 ft E. of the Portal) | ----- | 0.005 mg/l (Zn) 0.230 mg/l (Mn) -0.100 mg/l (Al) 76 mg/l (SO4) | ----- | ----- | ----- |
| approx 6,000 - 8,000 ft. E. of the Portal (RT-2) | ----- | ----- | ----- | 0.472 mg/l (Zn) 3.78 mg/l (Mn) .114 mg/l (Al) 986.0 mg/l (SO4) | ----- |
| Inter. Shaft approx 7,000 ft E. of the Portal (RT-Cave In) | ----- | ----- | .838 mg/l (Zn) 5.820 mg/l (Mn) .389 mg/l (Al) 1600 mg/l (SO4) | ----- | ----- |
| approx 700 ft E. of the Portal (RT-1) | ----- | ----- | ------ | 0.177 mg/l (Zn) 0.548 mg/l (Mn) less than 0.05 Mg/l (Al) 944 mg/l (SO4) | ----- |
| Tunnel Portal | ----- | ----- | less than 0.05 mg/l (Zn) less than 0.05 mg/l (Mn) 847 mg/l (SO4) no Al sample | ----- | 0.056 mg/l (Zn) less than 0.050 mg/l (Mn) less than 0.050 mg/l (Al) 840 mg/l (SO4) |

*See* Plaintiffs' Exs. 13, 23, 24, 60 and 61.

17.     Plaintiffs rely solely on the sampling data reported in Table 1 to support their claim against El Paso.  Plaintiffs did not conduct any water quality sampling of their own.

18.     Plaintiffs have never used devices such as flumes, pygmy meters, weirs, or artificial tracers inside the Roosevelt Tunnel to accurately measure water flow in the Tunnel or to determine the path of water flow from the Shaft.

III.    Motions to Exclude Expert Opinions Under Fed.R.Evid.702

Prior to trial, each party moved to exclude the expert opinions of the opposing party's expert witness for failure to satisfy the requirements of Fed.R.Civ.P. 702.  *See* Plaintiffs' Motion to Exclude Expert Opinions of Robert Brogden (Doc. #180; filed June 30, 2006); Defendant's Contingent Motion to Exclude Plaintiffs' Expert Witness Opinions (Doc. #178; filed June 30, 2006).[4]

Fed.R.Evid. 702 allows the parties to present scientific testimony through a qualified expert where such evidence "will assist the trier of fact to understand the evidence or to determine a fact in issue." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 n.7 (1993), the Supreme Court defined the role of the trial judge in admitting scientific testimony under Rule 702 as that of a "gatekeeper."  The Court listed four non-exclusive

_____

[4]In addition, El Paso filed a Motion in Limine to Exclude Exhibits and Testimony Not Disclosed Pursuant to Fed.R.Civ.P. 26 [Doc. #235].  El Paso argued that Dr. Maest's expert report failed to comply with Fed.R.Civ.P. 26(a)(1)(B)(requiring a party to disclose "a copy of any documents, data compilations, and tangible things . . . the disclosing party may use to support its claim or defenses").  El Paso moved to exclude Dr. Maest's testimony on any undisclosed documents, which included several of plaintiffs' trial exhibits, pursuant to Fed.R.Civ.P. 37(c)(1).  At the beginning of the trial, I advised the parties that I would not issue a blanket ruling on El Paso's motion, but would instead rule on contemporaneous objections from El Paso as the Plaintiffs sought to introduce objectionable evidence. (Tr. at 37-38). Because I have addressed Defendant's evidentiary objections at trial or in this Memorandum Opinion and Order, I deny Doc. #235 as moot.

factors which it deemed relevant in deciding whether to admit expert scientific testimony: (1) whether the opinion at issue is based on scientific knowledge,[5] is susceptible to testing, and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted by the scientific community. *Id.* at 593-94.

The objective of *Daubert's* gate-keeping requirement is to ensure the reliability and relevancy of expert testimony. "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 152 (1999). Accordingly, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony, but consideration of other factors is not precluded. *Id.* Expert testimony may be admitted based on the expert's professional knowledge, training, experience, and personal observations, where supported by solid evidence in the scientific community. *See St. Martin v. Mobil Exploration & Producing U.S., Inc.,* 224 F.3d 402, 406-07 (5th Cir.2000)(holding that ecologist's first-hand observation of flooded marsh combined with his expertise in marshland ecology were sufficiently reliable bases of his opinion on causation under *Daubert* to admit the testimony).

---

[5]The Supreme Court explained that scientific knowledge "implies a grounding in the methods and procedures of science" which must be based on actual knowledge and not "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590. In other words, "an inference or assertion must be derived by the scientific method . . . [and] must be supported by appropriate validation – ie. 'good grounds,' based on what is known." *Id.*

The court's focus is on "scientific principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. However, methodology and conclusions are not entirely distinct from one another. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elect. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, the expert's assertion that his method is accurate, without satisfying any other set of reasonable reliability criteria, is insufficient. *See Kumho Tire Co.*, 526 U.S. at 157-58; *see also, Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)*(*"At a minimum, the expert testimony should include a description of the method used to arrive at [his conclusion] and scientific data supporting the determination. The expert's assurance that the methodology and supporting data is reliable will not suffice").

In *Mitchell*, the circuit court elaborated on the proponent's burden under Fed.R.Evid. 702:

> Under *Daubert*, proposed expert testimony must be supported by "appropriate validation- ie., 'good grounds,' based on what is known." 509 U.S. at 590. The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is "generally accepted" in the scientific community. [Internal citation omitted]. Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements. *E.g., In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994).

*Mitchell*, 165 F.3d at 781-82; *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)(citing *Mitchell*).

The trial court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between the testimony of competing expert witnesses. Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The proponent has the burden of establishing admissibility of the expert testimony under Rule 702 by a preponderance of the evidence. *See* Fed.R.Evid. 104(a); Fed.R.Evid. 702 (Advisory Committee Notes for 2002 Amendments); *Bourjaily v. United States*, 483 U.S. 171 (1987).

With the foregoing legal principles in mind, I consider the evidence presented[6] to determine whether the parties' expert testimony is admissible to prove or refute the merits of plaintiffs' Clean Water Act claim.    The experts agreed that a pollutant fate and transport[7] analysis of the Roosevelt Tunnel was necessary to prove whether zinc and/or other pollutants in water flowing out of the Shaft into the Roosevelt Tunnel are transported approximately two and one-half miles through the Tunnel to the Portal and discharged into Cripple Creek.

---

[6]I held the Rule 702 hearing during the liability trial for purposes of judicial economy.

[7]"Fate" refers to the chemical changes to constituents along a flow path, and "transport" refers to how constituents move along flow paths from sources to receptors.

A.      Expert Opinions of Ann Maest, Ph.D.

Plaintiffs' expert, Dr. Ann Maest, is an aqueous geochemist specializing in the fate and transport of pollutants at hard rock mine sites.  El Paso moved to exclude Dr. Maest's expert opinions on the grounds that her opinions are not based on sufficient facts or data or on reliable scientific principles or methods.[8]

As a preliminary matter, I reject El Paso's contention that deficiencies in Dr. Maest's written expert report under Fed.R.Civ.P. 26(a)(2) bear on the admissibility of her expert testimony under Fed.R.Evid. 702.  The purpose of Rule 26(a)(2) is "to eliminate surprise and provide the opposing party with enough information regarding the expert's opinions and methodology to prepare efficiently for deposition, any pretrial motions and trial." *Cook v. Rockwell Int'l Corp.*, 2006 WL 3533049 at *41 (D.Colo. 2006) (Kane, J)(citing *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 682 (D.Kan. 1995)).  By contrast, Fed.R.Evid. 702 sets forth the circumstances under which expert testimony is admissible at trial.  The inquiries are distinct.  *See Cook*, 2006 WL 3533049 at *42.  Accordingly, I focus on Dr. Maest's testimony to determine whether the methods she used to reach her conclusions are scientifically sound and whether her opinions are based on facts which are sufficiently reliable.  *Mitchell*, 165 F.3d at 781.

---

[8]El Paso does not dispute Dr. Maest's qualifications to render opinions in the field of aqueous geochemistry.

Dr. Maest opined that measurable concentrations of zinc, manganese, sulfate, and aluminum[9] contained in the water entering the Roosevelt Tunnel from the Shaft are transported to the Portal and then discharged into Cripple Creek.[10]

I first consider the methodology Dr. Maest used in reaching her expert opinion. Dr. Maest testified that in conducting her fate and transport analysis, she first reviewed background information on the geology and mineralogy of the El Paso Mine and the Mining District.[11]  Her research revealed that there are substantial amounts of sulfides in the diatreme and the El Paso ore body – pyrite being the most common –  and a much lower amount of sulfides present in the granite outside the El Paso ore body in the area surrounding the Roosevelt Tunnel.

Dr. Maest also considered background information on pathways (the route that a constituent takes in going from sources to receptors) and receptors (the receiving stream(s)).  Her research showed that although the Carlton Tunnel was draining some water from the Roosevelt Tunnel, the Roosevelt Tunnel was still discharging water.[12] The same report indicated that the hydraulic conductivity of the granite floor of the Roosevelt Tunnel was about one inch of water per year.[13]

---

[9]Zinc, manganese, sulfate, and aluminum are "pollutants" within the meaning of the CWA and are subject to CWQCD regulation by permit . *See* 33 U.S.C. §1362(6); Testimony of David Akers.

[10]The scientific problem, as defined to Dr. Maest, is whether any amount of any pollutant entering the Tunnel from the Shaft reaches the Portal (where it is then discharged into Cripple Creek).

[11]*See* Plaintiffs' Exs. 27, 90, 91.

[12]Ex. 90, CC&V Amendment No. 7 to Office of Mined Land Reclamation Permit M-80-244, July 1998, at Bates ##1661-64; Ex. 91, CC&V Amendment No. 8, Office of Mined Land Reclamation Permit M-80-244, March 2000, Evaluation of Hydrogeochemical Effects of Mine Extension Under Amendment No. 8, Cresson Project, CO., at Bates ##717-718, and attachment 5, Hydrologic Evaluation, CC&V, Cresson Project Expansion,  Adrian Brown Innovative Environmental Solutions, April 30, 1998.

[13]Ex. 91, attachment 5.

Next, Dr. Maest created a conceptual model - a qualitative description of the relevant hydrologic, hydrogeologic, and geochemical principles operating on the constituents and their movement from sources to receptors, through pathways.  The hydrologic and hydrogeologic processes which Dr. Maest considered, and with which she works on a regular basis, are hydraulic gradient and hyrdraulic conductivity.   The Roosevelt Tunnel was drilled at a gradient of about one percent – i.e., it loses a foot of elevation every one hundred horizontal feet, allowing it to drain mines.   Hydraulic conductivity refers to the ability of rock to transmit water based on the number of fractures in the rock and how connected they are.  Dr. Maest's conceptual model for these principles is that water from the surface flows through the Shaft, which is in the El Paso ore body. The water flowing through the Shaft enters the Roosevelt Tunnel, where it flows down gradient towards the Portal.  Along the way, precipitation from the surface also enters the Tunnel through its walls and ceiling by means of fractures in the granite rock.  Water is discharged from the Portal into Cripple Creek on an intermittent basis.[14]

Dr.   Maest reviewed all available visual inspection reports made by CC&V employees and EPA staff of water flows inside the Tunnel and at the Portal.[15] Relying on the inspection reports documenting continuous water flow inside the Roosevelt Tunnel between the Shaft and the Portal, Dr. Maest used the transport methodology of visual observation to support her opinion that there is a hydrological connection between the water entering the Tunnel at the Shaft and the water discharged at the Portal.   Dr. Maest testified that visual observation of surface flow is a sound scientific methodology to

---

[14]Plaintiffs' Ex. 5.

[15]S*ee* Plaintiffs' Exs. 5, 43, 51, 62; Defendants' Ex. B, attachment B.

establish the existence of uninterrupted surface flow between two points.   Dr. James McCord, a hydrologist, and Robert Brogden, El Paso's expert hydrologist, agreed.

Dr. Maest also looked at baseline (or "background") water quality[16] as part of her background research,  reviewed water quality sampling data taken from water discharged from the Portal into Cripple Creek, and reviewed sample data from water flowing inside the Tunnel.[17]  The sample data allowed her to characterize the quality of the water entering the Tunnel from the Shaft as acid mine drainage water: high metals and sulfate concentrations, and low pH.

For establishing baseline water quality, Dr. Maest considered one water sample taken inside the Roosevelt Tunnel from water which she understood to be entering the ceiling through fractured granite between the Shaft and the Portal.[18]   Dr. Maest characterized this sample as calcium bicarbonate water (lower concentrations of sulfates and metals, and higher pH values  than the water flowing out of the Shaft).  Dr. Maest also looked at water quality samples taken from groundwater wells in the District[19] to determine the baseline  water quality.  These well samples also contained low sulfate and metal concentrations, and higher pH values than the Shaft water and some bicarbonate.

_____

[16]Dr. Maest defined "background water quality" as the quality of water in the area of interest without the presence of the pollution source that she was addressing – in this case, the water quality of the granite and surrounding rocks in the Cripple Creek Mining District in areas where mining activity was not conducted.

[17]See Plaintiffs' Exs. 13, 23, 24, 53, 60, 61, 65.

[18]Plaintiffs' Ex. 23, sample taken at RT-EP 4000 on October 14, 1994.

[19]Plaintiffs' Ex. 61.

Dr. Maest described the quality of the water at the Portal as of intermediate composition between her asserted background water and the Shaft water:  relatively elevated sulfate concentrations, variable pH levels, and variable metal concentrations.

Dr. Maest also considered the following geochemical processes, which she typically works with in her field: precipitation,[20] dissolution,[21] solubility,[22] oxidation,[23] adsorption,[24] and neutralization.[25] Dr. Maest's conceptual model incorporating the relevant geochemical principles is the following: when water and oxygen enter the Shaft, sulfide minerals present in the shaft oxidize, producing acid.  The acid lowers the pH level of the water, causing minerals in the Shaft to dissolve partially; upon dissolution, the constituents in the minerals (such as zinc, manganese, sulfate, and aluminum) become part of the water flow.  Suspended and solid particles and dissolved metals flow with the Shaft water toward the Portal.  There are also solid particles on the Tunnel floor.  Some of the metals remain dissolved in the water, while other metals precipitate out of the solution, adsorb onto the suspended particles and move toward the Portal with the water flow.  Other metals remain on the Tunnel floor and can adsorb other metals.  Sulfate does not precipitate or adsorb

---

[20]Precipitation occurs when a metal that is completely dissolved in solution increases in concentration to the point where it solidifies out of the solution.

[21]Dissolution occurs when minerals (such as sulfides) are exposed to water, the water pulls out some of the metals and other constituents, and those metals and constituents travel with the water flow.

[22]Solubility refers to the concentration level of a constituent in the water before it turns into a solid.

[23]Oxidation occurs when a solution or a raw mineral is exposed to oxygen.

[24]Adsorption occurs when a metal adheres to the surface of another metal that has already solidified.

[25]Neutralization occurs when a bicarbonate or base water mixes with an acidic solution to make the acidic solution more neutral.

– it stays in the solution and moves with the water towards the Portal. Sulfate is not affected by geochemical reactions, except for dilution. The whole mass of water flowing from the shaft towards the Portal mixes with water entering the Tunnel from fractures in the granite walls and ceiling ("granite seeps"). The granite seep water dilutes the acidity of the Shaft water, lowering the metal and sulfate concentrations.

Dr. Maest testified that because the pH values of the Shaft water and the granite seep water are so different, when the two waters mix, zinc and other metals precipitate out of the water and adsorb onto manganese and other solids that were precipitated. Because precipitation and adsorption are occurring, zinc and other metal concentrations decrease dramatically as water moves towards the Portal; however, the zinc levels never drop to zero, and at times of high flow at the Portal they are quite elevated. Dr. Maest explained that these geochemical processes explain the quality of the water that is discharged at the Portal.

Dr. Maest testified that comparing the water quality data to known geochemical principles and then consulting her scientific reference materials to determine whether she would expect precipitation and adsorption to be occurring is an accepted scientific methodology.[26]

Dr. Maest also used the methodology of synoptic water quality sampling -- comparing the concentrations of constituents in water samples taken from different points on the same day, or samples taken close in time. She testified that synoptic sampling

---

[26]For example, Dr. Maest looked at the manganese concentrations in the water quality samples, the pH levels, and the solubility of manganese, to determine whether a solubility is exceeded and precipitation will occur. Graphs identify the adsorption of zinc onto manganese, a reaction that is controlled by the pH level of the water. Dr. Maest stated that she can determine whether adsorption is occurring based on the presence of certain precipitates and the pH level of the water.

removes the need to account for the variability in water flows inside the Tunnel. Specifically, Dr. Maest examined the November 16, 2000, in-Tunnel water quality data and the October 30, 2000, water sample taken at the Portal.[27]   According to Dr. Maest, this synoptic sampling data shows that there is dilution occurring, but the substantial decreases in concentration cannot be explained by dilution alone, and must be the result of precipitation and adsorption.  Dr. Maest calculated, based on this data, that more than zero but less than ten percent of the zinc and manganese from the Shaft water was discharged at the Portal.  She further opined that the October 30, 2000, and November 16, 2000, data was generally representative of the concentrations of constituents discharged in the Tunnel, with some variability during times of higher flows.

Dr. Maest stated that it was unnecessary for her to collect additional water samples at various locations along the Tunnel on the same day, or to perform a dye or other artificial tracer test in this case because she used sulfate as a natural tracer to confirm that some flow and some pollutants from the shaft were reaching the Portal.

Dr. Maest explained that a natural tracer – another fate and transport methodology – can be used to trace constituents along a pathway from a source to the receptor.  A natural tracer is a constituent that originates from the source under study, but is not affected by geochemical reactions.  According to Dr. Maest – and Dr. James McCord, plaintiff's expert in the field of hydrology, groundwater fate and transport analysis, and recharge and tracer analysis – sulfate is a reliable natural tracer in the Roosevelt Tunnel because of the large contrast between the concentrations of sulfate in the Shaft water and

---

[27]Because there is no water quality data at the Portal on November 16, 2000, Dr. Maest used the water quality sample taken from the Portal on October 30, 2000, the sample taken the next closest in time.

the granite inflows.[28]  The sulfate concentrations in water entering the Tunnel from the Shaft are high and decrease as water flows toward the Portal, but sulfate levels do not decrease on the same level of magnitude as the metals because sulfate does not participate in geochemical reactions – i.e., it does not precipitate or adsorb onto solids. The fact that the sulfate levels are decreasing as the water flows towards the Portal demonstrates that the water entering the Tunnel from granite seeps has lower sulfate concentrations than the Shaft water and is diluting that water when the two mix.  However, the concentrations of sulfate discharged at the Portal are still higher than concentrations found in the purported granite seep water.  Thus, Dr. Maest concludes that the only explanation for the elevated sulfate levels at the Portal is that they originate in the Shaft water.

I am persuaded that Dr. Maest's opinion that pollutants contained in water entering the Roosevelt Tunnel from the Shaft are discharged at the Portal is based on scientific principles and methodology.  Dr. Maest comprehensively explained at trial her conceptual models and methodologies. Plaintiffs have demonstrated that Dr. Maest's conclusions are connected to the existing water quality data by more than the *ipse dixit* of the expert.

Dr. Arthur O'Hayre, an expert in hydrology and geochemistry specializing in the fate and transport of pollutants, testified for El Paso that Dr. Maest's methodology was not reliable and that her opinions were not based on sufficiently reliable facts.  I have carefully considered Dr. O'Hayre's challenges to the reliability of Dr. Maest's methodologies and the

---

[28]Dr. McCord testified that the single sample taken from a purported granite seep inside the Tunnel was sufficient to characterize the water quality of the granite inflows because of the corroborating background data from the groundwater wells in the District. I note that the water quality data for the groundwater wells, Plaintiffs' Ex. 61, was admitted for Rule 702 purposes only.  Consequently, the groundwater well data cannot be used substantively to establish baseline water quality.

data on which her opinion is based. I find that some of Dr. O'Hayre's challenges go to the weight, but not the admissibility, of Dr. Maest's expert opinions.[29] Other challenges are not supported by concrete evidence.[30]

I find and conclude that Plaintiffs have shown that the methodologies employed by Dr. Maest in reaching her opinion were scientifically sound and that Dr. Maest's opinion was based on facts which sufficiently satisfy Rule 702's reliability requirements. *See Mitchell*, 165 F.3d at 781-82. I therefore deny El Paso's motion to exclude Dr. Maest's expert opinion.

B.    Admissibility of Robert Brogden's Expert Testimony

El Paso's expert, Robert Brogden, is an expert in the fields of geology, groundwater geology, and hydrology. Plaintiffs moved to exclude Mr. Brogden's opinions as irrelevant

---

[29]For example, Dr. O'Hayre challenges the reliability of Dr. Maest's methodologies because there is a lack of information about the amount of polluted water exfiltrating through the Tunnel floor before it reaches the portal. The evidence shows that Dr. Maest reviewed information on the Carlton Tunnel as part of her background research and rejected the Carlton Tunnel as a major influence of exfiltration of water from the Roosevelt Tunnel. Dr. Maest opined that it was unlikely that all of the water flowing into the Roosevelt Tunnel from the Shaft exfiltrates through the Tunnel floor before it reaches the Portal because the Tunnel was built to drain water and it has continued to do so, even after construction of the Carlton Tunnel. In addition, although there are fractures in the granite where some water probably does exit the Tunnel, the videotaped inspection showed that the Tunnel floor is covered in many places with falls of ground debris. Dr. Maest also testified that the metals that precipitate out of the water would act like putty in the cracks to prevent large amounts of exfiltration. El Paso's evidence that the Tunnel loses substantial amounts of water between the Shaft and the Portal, which is based, in part, on a visual inspection report, affects the weight, but not the admissibility, of Dr. Maest's testimony. *See* May 26, 1995 CDPS/NPDES Facility Inspection Report of Roosevelt Tunnel from Tom Boyce, attached to Defendant's Ex. C (describing flow as fluctuating numerous times from lows of about 2 gpm to highs of about 15 gpm between the portal and the El Paso shaft).

[30]For example, Dr. O'Hayre criticizes the reliability of Dr. Maest's methodology because Dr. Maest concluded from the inspection reports that water enters the Roosevelt Tunnel from two sources - the Shaft and precipitation from the surface flowing down through fractures in the granite – but she did not account for the possibility that Arequa Gulch or Cripple Creek, drainages that are above the relevant area of the Roosevelt Tunnel, could be a possible source of inflows to the Tunnel. Dr. Maest testified that she was not aware of elevated zinc levels in Arequa Gulch and that the Roosevelt Tunnel was situated "quite a distance below" Cripple Creek. El Paso did not proffer any evidence, other than Dr. O'Hayre's unsupported testimony, to show that either water source was contributing pollutants to the water flowing from the Shaft to the Portal. Accordingly, I reject El Paso's argument as a basis to hold that Dr. Maest's methodology was unreliable or that the facts supporting Dr. Maest's opinion were unreliable.

and on the ground that his conclusions are not supported by the facts and data considered.[31]

At trial, Mr. Brogden opined that the water flows in the Roosevelt Tunnel fluctuate due to inflows and outflows, and that there is not enough data to understand the flow system in the Tunnel or to identify the sources of water at the Portal.  Mr. Brogden further opined that it is likely that all of the water from the Shaft leaves the Tunnel before it reaches the Portal and is replaced with different water having similar chemical characteristics.  Mr. Brogden concedes, however, that precipitation and sedimentation on the Tunnel floor may reduce the permeability of the floor.

Mr. Brogden's opinions were based on the following facts and data: (1) the Roosevelt Tunnel is situated in the dewatered part of the Carlton Tunnel; the Carlton Tunnel has lowered the water table below the bottom of the Roosevelt Tunnel, allowing water to move out of the Roosevelt Tunnel and down to the Carlton; (2) the Roosevelt Tunnel inspection reports, particularly the Boyce inspection report, indicate large fluctuations in flows inside the Tunnel and areas of high porosity (fractures) in the granite rock; (3) the Portal flow data shows that there are times when flow does not exit the Portal.

Mr. Brogden described the flow system inside the Roosevelt Tunnel as a dynamic flow system: it changes with time because of the differences in recharge rates, and it changes in place because there could be more recharge in one area of the Tunnel than in another area.   According to Mr. Brogden, the amount of inflows into the Tunnel vary because they are the result of recharge from snowmelt and other large precipitation events

---

[31]Plaintiffs do not dispute Mr. Brogden's qualifications to render opinions in the fields of geology, groundwater geology, and hydrology.

at the surface, whereas the amount of water exfiltrating through the Tunnel floor remains fairly constant.

Mr. Brogden obtained the width and depth measurements taken by CC&V employees during the Tunnel inspection on November 16, 2000, noted the distances from the Portal at which the measurements were taken, and applied a restricted weir equation and Manning's equation to calculate gallon per minute ("gpm") flow values which he then plotted on a graph.[32]  Mr. Brogden cautioned that the numbers depicted on the graph did not represent actual flow values and are best understood to show that there are fluctuations in the flow between the Shaft and the Portal.

Plaintiffs' expert, Dr. McCord, testified that Mr. Brogden did not have sufficient facts and data upon which to apply the equations he used to calculate flow velocities in the Tunnel on November 16, 2000, or that Mr. Brogden likely over-estimated the flow velocities in applying the Manning and weir equations to the known data.

Dr. McCord further challenged Mr. Brogden's opinion that all of the Shaft water may exfiltrate through the Tunnel floor before reaching the Portal.  Dr. McCord testified that the exfiltration rate of water out of the granite floor of the Tunnel should be no greater than one ten thousandth of a meter per second.[33]

I deny Plaintiffs' motion to exclude Mr. Brogden's opinions as irrelevant.  As I ruled during trial, the circuit court reversed Judge Coan's grant of summary judgment in favor

---

[32]Defendant's Ex. V.

[33]*See* R. Allen Freeze and John A. Cherry, *Groundwater*, Table 2.2 Range of Values of Hydraulic Conductivity and Permeability, at 29, and 159, Plaintiffs' Ex.103.

of the plaintiffs because of material factual issues, but it did not conclusively determine

whether the water entering the Tunnel from the Shaft reaches the Portal.

I further find that Mr. Brogden's opinions are supported by the facts and data he

considered.  Mr. Brogden's estimates about water flow velocities inside the Tunnel on

November 16, 2000, were meant to show only that there are fluctuations in flow inside the

Tunnel.  His method was scientifically sound for the limited purpose the calculations were

intended to serve, and his calculations are based on sufficiently reliable facts and data.

Further, although Plaintiffs have presented strong evidence to counter Mr. Brogden's

opinion that all of the water entering the Tunnel from the Shaft likely exfiltrates through the

Tunnel floor before it reaches the Portal, Plaintiffs'  evidence goes to the weight, but not

the admissibility, of Mr. Brogden's opinion.  *See Daubert*, 509 U.S. at 596   Accordingly,

I deny Plaintiffs' Motion to Exclude Expert Opinions of Robert Brogden.

IV.    Conclusions of Law

1.    Plaintiffs' evidence concerning the use of a sulfate tracer as a natural

tracer fails to prove the path of water flow from the Shaft and the fate of pollutants in

that flow because the evidence is insufficient to show the chemical signature of the

granite inflows or the baseline water quality in the Mining District.   Both Dr. Maest and

Dr. McCord testified that to use a natural tracer to support a fate and transport analysis,

there must be a clear distinction between the concentration at the source and the

concentration naturally occurring in the environment.

2.    The sole evidence offered by Plaintiffs to establish the baseline water

quality for purposes of their natural tracer theory is a single water sample taken on October 14, 1996, at a location designated as RT-EP 4000.[34]   At least two other samples were taken that same day, at locations RT-EP 2000 and RT-EP 3000.[35]   The sampling data in no way distinguishes the samples taken at RT-EP 2000, RT-EP 3000, and RT-EP 4000.[36]   In particular, the sampling data in no way indicates that the sample at RT-EP 4000 was taken from a granite seep in the Tunnel wall while samples RT-EP 2000 and RT-EP 3000 were taken from water flowing along the Tunnel floor.[37]   The evidence indicates that all other in-Tunnel samples were taken from water flowing on the Tunnel floor.   Dr. Maest's natural tracer theory, however, depends on precisely that distinction – that the sample at RT-EP 4000 reflects baseline water quality without any added pollutants from the El Paso Mine because it originated from a granite seep, while the other two samples reflect water entering the Tunnel from the Shaft and containing pollutants from the El Paso Mine.

The basis of Dr. Maest's understanding that the sample taken at RT-EP 4000 represents water taken from a granite seep is a notation on Plaintiffs' Ex. 16 that a sample with the same chemical levels originated in "granite."[38]   In addition, David

---

[34]Plaintiffs' Ex. 23.  The evidence indicates that RT-EP 4000 is a location approximately 4,000 feet west of the Shaft, between the Shaft and the Portal.  *Id.* at Bates #786.

[35]Plaintiffs' Ex. 23.  RT-EP 2000 is a location approximately 2,000 feet west of the Shaft and RT-EP 3000 is a location approximately 3,000 feet west of the Shaft, both between the Shaft and the Portal. *Id.* at Bates #786.

[36]Plaintiffs' Ex. 23 at Bates #786.

[37]*Id.*

[38]Plaintiffs' Ex. 16 at Bates #291.

Akers, who oversees permitting compliance and enforcement for the CWQCD, testified as follows:

Q:     What does – do you see the column that says "Granite"?

A:     Yes.

Q.     What does that represent?

A.     I believe that represents the quality of water that was, in essence, seeping out of the granite in the Tunnel."

Tr. at 945, lines 4-10.

Mr. Akers' inconclusive belief concerning the origin of the water quality sample discussed at a CC&V presentation which he attended more than five years ago and concerning water samples taken nearly five years before the presentation are inadequate to convince me that the water sample collected at RT-EP 4000 was taken from a granite seep while the identically described samples collected at RT-EP 2000 and RT-EP 3000 were taken from water on the Tunnel floor.

The record lacks credible evidence from which I can reliable conclude that the sample at RT-EP 4000 came from a seep in the granite wall of the Roosevelt Tunnel. Without that evidence, Plaintiffs have failed to establish the baseline water quality, and their natural tracer theory collapses because they cannot distinguish the water quality at the Portal from the baseline water quality.

3.     Plaintiffs failed to provide sufficient foundation to allow me to admit evidence about baseline water quality as reflected in water quality samples taken from groundwater wells in the Mining District.

4.     Dr. Maest did not have sufficient data to exclude the possibility that the

24

pollutants discharged at the Portal originated from granite inflows.  Because there is variability in the mineral composition of the granite rock, those inflows are a potential source of pollution to flows inside the Tunnel.

5.      Plaintiffs have not provided an objective scientific explanation for the wildly fluctuating zinc levels in the Roosevelt Tunnel and there is not enough consistent water quality sampling data inside the Roosevelt Tunnel to simply disregard two of the ten interior  samples as anomalous.  Although precipitation and adsorption is an objective scientific explanation for the reductions in metal concentrations in the flows between the Shaft and the Portal on August 7, 2001, and on November 16, 2000 (using the October 30, 2000 data for the Portal), there is no explanation for what is occurring inside the Tunnel, approximately 2000 feet and 3000 feet west of the Shaft, at RT-EP 2000 and RT-EP3000, on October 14, 1994.

6.      Plaintiffs have failed to prove, by a preponderance of the evidence, that pollutants entering the Roosevelt Tunnel from the Shaft (a point source) are discharged at the Portal into Cripple Creek (a navigable water).

7.      Plaintiffs have failed to prove that El Paso violated the Clean Water Act.

V.     Order

For the reasons discussed above, it is

HEREBY **ORDERED** that:

(1) Defendant's Contingent Motion to Exclude Plaintiffs' Expert Witness Opinions [Doc. #178; filed June 30, 2006], is **DENIED**;

(2) Plaintiffs' Motion to Exclude Expert Opinions of Robert Brogden [Doc. #180; filed June 30, 2006], is **DENIED**;

25

(3) Defendant's Motion in Limine to Exclude Exhibits and Testimony Not Disclosed Pursuant to Fed.R.Civ.P. 26 [Doc. #235; filed February 1, 2007], is **DENIED AS MOOT**;

(4) Judgment is entered in favor of El Paso Properties, Inc. (formerly known as El Paso Gold Mines, Inc.) and against Plaintiffs Sierra Club and Mineral Policy Center; and

(5) Defendant El Paso Properties, Inc. is **AWARDED** its costs, to be taxed by the Clerk of the Court pursuant to Fed.R.Civ.P. 54(d)(1) and D.C.COLO.L.CivR 54.1.

(6) This action is **DISMISSED WITH PREJUDICE.**

Dated June 4, 2007.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge